UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA, | CRIMINAL NO. 18-89 (JRT/DTS) |
| Plaintiff, | |
| v. | ORDER & <br> REPORT AND RECOMMENDATION |
| MARQUIS WILLYJOHN TUCKER, <br> *a/k/a Marquis Willyjo Tucker,* | |
| Defendant. | |

Jeffrey S. Paulsen, Assistant U.S. Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, Minnesota 55415, for Plaintiff;

Keala C. Ede, Assistant Federal Public Defender, Office of the Federal Defender, 107 U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for Defendant Marquis Willyjohn Tucker.

## INTRODUCTION[1]

Defendant Marquis Willyjohn Tucker ("Tucker") is charged with being a felon in possession of a firearm. Police discovered the firearm in question while frisking Tucker during a drug sting targeting another individual. Arguing that the police lacked reasonable suspicion to conduct a stop-and-frisk, Tucker seeks to suppress the gun and other evidence. For reasons detailed below, the Court recommends that Tucker's motion to suppress be denied.

Tucker also seeks disclosure of a confidential informant whom the police used during the drug sting operation. Following arguments from the parties at the July 9,

---

[1] This matter was referred to the undersigned for a Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1.

2018 hearing, the Court took this request under advisement. Having fully considered the issue, Tucker's motion is denied.

## FINDINGS OF FACT

### I. Tucker's Detention, Search and Arrest

Following complaints from neighbors, St. Paul police began to target suspected drug dealers doing business near the Twins Market, a neighborhood convenience store. July 9, 2018 Hr'g Tr. 13-14 ("Tr."), Docket No. 34. A confidential informant ("C.I.") identified Kevin White as a drug dealer active around the Market. *Id.* at 14-15. The police had heard rumors that White carried guns on buys or was accompanied by people who carried guns. *Id.* at 49-50. Officers used the C.I. to make two controlled buys of cocaine and marijuana from White. *Id.* at 15-17. The first buy occurred at the Twins Market, the second occurred approximately six blocks away. *Id.* at 17.

The police then organized a third controlled buy on March 27, 2018, using the same C.I. *Id.* They intended to arrest White after the buy. *Id.* Officers spotted White drive into the area of their surveillance at approximately 4:30 p.m. and park on Frank Street, which borders the east side of Margaret Park. *Id.* at 17-19; Gov't Ex. 1 (aerial view of Margaret Park and surrounding neighborhood); Def.'s Ex. 1 (Aerial view of Margaret Park and Twins Market). Officer Bragg, the C.I.'s "handler," was parked on Margaret Street, which forms the southern border of the park, just west of the park. *Id.* at 19; Gov't Ex. 1. Officer Sauer and two other officers were parked in an unmarked SUV about two blocks from White, south of the park. Tr. 49-51. Other officers were stationed in the area for surveillance. Tr. 47.

After White's arrival, the C.I. left Officer Bragg and walked the length of the park to White's car. Officer Bragg testified, though apparently did not note in his report, that

2

he checked the C.I. to ensure that he was not carrying any drugs into the buy. *Id.* at 20, 30. Officer Bragg also stated that, with binoculars and because of the lack of foliage on the trees, he was able to see White's car and the C.I. the entire time. *Id.* at 40-41.

Officer Bragg watched the C.I. approach White's car, spend approximately two minutes at the window, and then leave. *Id.* at 21, 41-42. Although there were other people around White's car, Officer Bragg does not remember if any of them were Tucker. *Id.* at 42. After leaving White, the C.I. called to confirm that White had sold the C.I. cocaine. *Id.* at 21. Once the C.I. was back and handed Officer Bragg what appeared to be—and later tested positive as—cocaine, the officer radioed for the other units to move in to arrest White. *Id.* at 22.

After receiving the call from Officer Bragg, Officer Sauer and his partners drove from their location southeast of the park to White's car. *Id.* at 48-50; Gov't Ex. 1; Gov't Ex. 2 (Video: Officer Sauer's bodycam (March 27, 2018)). During the less than 30-second trip, another officer warned over the radio to "be advised of those other guys" that appeared to be buying from White. Gov't Ex. 2; Tr. 51-52.

When Officer Sauer pulled up behind White's car, Tucker, who was wearing a bucket hat, was standing behind another individual, who was at the driver's side window. Gov't Ex. 2; Tr. 52. Officer Sauer got out of his SUV and ordered everybody to stay where they were and show him their hands. Gov't Ex. 2; Tr. 53. As he got closer, Officer Sauer saw what appeared to be marijuana on the center console and two other people besides White in the vehicle. Tr. 53-55, 72-73; Gov't Exs. 4-5 (photographs of White's vehicle).

Officer Sauer then ordered Tucker to turn around, at which point he handcuffed him and asked whether he had any weapons while patting down the outside of his

clothes. Gov't Ex. 2; Tr. 56. Officer Sauer found a loaded handgun tucked into the waistband of Tucker's pants. Gov't Ex. 2; Tr. 56-57; Gov't Ex. 3 (photograph of Smith & Wesson). The officer then had Tucker lean against the police SUV while he continued to investigate and handle the suspects still in the car. Tr. 57-58; Gov't Ex. 2.

Officer Sauer called in a check for the serial number on the handgun and discovered it was stolen. Tr. 58-59; Gov't Ex. 2. At that point, Tucker was placed under arrest and another officer searched him more thoroughly. Tr. 59. The officer found cocaine and money in Tucker's pocket. *Id.*

## II.   The Government's Representations

In its briefing and during the July 9, 2018 hearing, the Government made two representations to the Court. First, the Government stated that it would not be offering into evidence at trial the DNA swab taken from Tucker during his booking. Gov't's Consolidated Resp. to Def.'s Pretrial Mots. 4. Docket No. 29. Second, the Government represented that it would not use any statements made by Tucker during an interrogation that followed his arrest. *Id.*; Tr. 3.

## CONCLUSIONS OF LAW

### I.   Motion to Suppress Evidence (Docket No. 19)

Tucker seeks to suppress (1) the handgun found in his waistband and (2) the cocaine found in his pocket.[2] "[W]herever an individual may harbor a reasonable expectation of privacy, he is entitled to be free from unreasonable governmental intrusion." *Terry v. Ohio,* 392 U.S. 1, 9 (1968) (internal citation omitted). However, "what

---

[2]   As part of his motion to suppress evidence, Tucker had sought to suppress the DNA sample taken from him during his booking. Further, he had moved to suppress statements made during an interrogation following his arrest (Docket No. 20). Because the Government has represented that it will not introduce either of these in its case-in-chief, the Court recommends the motions be denied as moot.

the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures." *Id.* (quoting *Elkins v. United States*, 364 U.S. 206, 222 (1960)). Both of the items Tucker seeks to suppress were seized under circumstances that did not require a warrant, and thus did not violate his Fourth Amendment rights.

### A.    The Handgun

Officer Sauer found the handgun in Tucker's waistband as part of a lawful *Terry* stop. There is no question that the police had detained Tucker by handcuffing him before his arrest. Tr. 57. Rather, Tucker challenges the basis for that detention and the subsequent frisk.

Under *Terry v. Ohio*, a police officer may "conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). "When a team of law enforcement officers is involved in an investigation, the issue is whether all the information known to the team provided 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant' the investigative stop." *United States v. Collins*, 883 F.3d 1029, 1032 (8th Cir. 2018) (quoting *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007)). A court examines the totality of the circumstances in determining whether the officers had a sufficient basis to suspect criminal activity. *Id.*

Viewing the totality of the circumstances, there were sufficient facts to support the police's suspicion that Tucker was involved in criminal activity. Using the C.I., officers had just conducted a third controlled buy from White. As they approached to arrest White, Officer Sauer and his colleagues were informed that two men were at White's car and appeared to be buying drugs. They saw Tucker standing next to the vehicle along with another person who was leaning into the driver's side window, where

5

a bag of marijuana was in plain view on the console. Although "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person," *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979), it may support the reasonable suspicion to conduct an investigatory stop. *United States v. Bustos-Torres*, 396 F.3d 935, 942-43 (concluding that, based on the circumstances, an officer could reasonably suspect an individual of buying drugs from someone the officer had reasonable suspicion of being a dealer); *see also United States v. Quinn*, 812 F.3d 694, 697-98 (8th Cir. 2016) (holding that "a person's temporal and geographic proximity to a crime scene, combined with a matching description of the suspect, can support a finding of reasonable suspicion." While Officer Sauer was not given a description of Tucker or the other person, he arrived seconds later, and could thus reasonably conclude that the two individuals at the car were the same people he had been told appeared to be buying drugs.

Officer Sauer's subsequent frisk of Tucker was also reasonable. Generally, any search of an individual conducted as part of an investigatory stop is limited to the purpose of protecting the police and the public, "and it must therefore be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments . . . ." *Terry*, 392 U.S. at 29. The officer must be "justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or others." *Id.* at 24. "Because weapons and violence are frequently associated with drug transactions, it is reasonable for an officer to believe a person may be armed and dangerous when the person is suspected of being involved in a drug transaction." *Bustos-Torres*, 396 F.3d at 943.

Here, as in *Bustos-Torres*, the police confronted several individuals who, besides White, were unknown to them but were suspected of being part of a drug deal. *Id.* (noting as relevant that the investigating officers were dealing with three unknown men). White had been rumored not only to carry a gun, but to travel with people who did so. The incident also occurred near a park where children were playing, heightening the risk to public safety. Tr. 19-20. Based upon the bodycam video, Officer Sauer's frisk was appropriately limited, patting down only the outside of Tucker's clothing until he appeared to feel something, at which point he reached into Tucker's waistband and pulled out the gun. Gov't Ex. 2.

Because Officer Sauer's detention and frisk of Tucker were reasonable, the resulting seizure of the handgun did not violate Tucker's Fourth Amendment rights and need not be suppressed. *See, e.g.*, *Minnesota v. Dickerson*, 508 U.S. 366, 377 (1993) ("The seizure of an item whose identity is already known occasions no further invasion of privacy.").

### B. The Drugs

Finding that the seizure of the handgun was reasonable, the subsequent arrest and incidental search of Tucker were also reasonable. "It is well settled that a search incident to a lawful arrest is a traditional exception to the warrant requirement of the Fourth Amendment." *United States v. Robinson*, 414 U.S. 218, 224 (1973). The concerns for officer safety and the destruction of evidence are present in all custodial arrests. *Riley v. California*, 134 S.Ct. 2473, 2477 (2014) (discussing *Robinson*). The search incident to arrest is limited to "the area within the arrestee's immediate control." *Id.* (citing *Chimel v. California*, 395 U.S. 752 (1969)).

Upon discovering the gun during the frisk, Officer Sauer helped to secure the rest of the scene and then investigated the ownership of the gun. Once he knew the gun was stolen, the police had probable cause to arrest Tucker. *See United States v. Adams*, 346 F.3d 1165, 1169 (finding probable cause to arrest defendant where he admitted to receiving guns from another who had admitted they were stolen). Incident to that arrest, they could search Tucker's person, not just for weapons, but for any evidence. Thus, the subsequent discovery of the cocaine in Tucker's pocket was the product of a search incident to a lawful arrest.

## II.     Disclosure of Confidential Informant (Docket No. 25)

Tucker also seeks the identity of the confidential informant. Although the Government generally has a privilege to withhold the identity of a confidential informant, "[w]here the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Roviaro v. United States*, 353 U.S. 53, 60-61 (1957). The Supreme Court has noted that "[m]ost of the federal cases involving this limitation on the scope of the informer's privilege have arisen when the legality of a search without a warrant is in issue and the communications of an informer are claimed to establish probable cause." *Id.* at 61. But "the defendant has the burden of showing that the need for disclosure outweighs the government's privilege . . .." *United States v. Lapsley*, 263 F.3d 839, 841 (8th Cir. 2001).

Tucker has not satisfied his burden of showing that disclosing the informant would actually be relevant and helpful to his case so as to outweigh the Government's privilege. The C.I. forms no part of the probable cause for Tucker's arrest. The C.I. was relevant, if at all, in creating the reasonable suspicion to detain and frisk Tucker, which

was when the gun was discovered. But, as discussed above, the C.I.'s representation that he had bought cocaine from White formed only part of the reasonable suspicion to detain Tucker and the others in and around White's vehicle. *See Quinn*, 812 F.3d at 698 (holding that, because reasonable suspicion is based on a totality-of-the-circumstances, it cannot be overcome by a "divide-and-conquer" approach). By contrast, the cases Tucker cites to support disclosure involve an informant the defendant claimed could corroborate his defense, *Lapsley*, 263 F.3d at 842, or where probable cause "hinge[d] on the reliability or even the existence of one informant," *United States v. Abramson*, 553 F.2d 1164, 1168 (8th Cir. 1977); *Cochran v. United States*, 291 F.2d 633 (8th Cir. 1961). Neither is the case here and there is no need for the Government's privilege to give way.

## ORDER

For the reasons set forth above, IT IS HEREBY ORDERED THAT:

1. Defendant's Motion to Disclose and Make Informants Available for Interview [Docket No. 25] is DENIED.

## RECOMMENDATION

For the reasons set forth above, THE COURT RECOMMENDS THAT:

1. Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 19] be DENIED.

2.	Defendant's Motion to Suppress Statements, Admissions, and Answers [Docket No. 20] be DENIED as moot based on the representations of the Government that it will not introduce any statements made by the Defendant while in custody.

Dated:	September 24, 2018

*s/ David T. Schultz*
DAVID T. SCHULTZ
United States Magistrate Judge

### NOTICE

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections. LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).